UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Ashlee M., | ) | |
| | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50256 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|     *Defendant*. | ) | |

### MEMORANDUM OPINION AND ORDER

This Social Security disability case must be remanded because the ALJ's ruling—that Plaintiff could do sedentary work despite her alleged back pain—was not fully explained or adequately supported by a medical opinion. Although it is unclear whether Plaintiff will ultimately prevail in her disability claim, it is clear that more analysis is needed.

### BACKGROUND[1]

In July 2015, Plaintiff strained her back while working as a nurse's assistant. She was then 25 years old. She then began treatment with Dr. Michael McFadden, a primary care physician. In October, she further injured her back while attempting, along with a co-worker, to move a severely obese patient. To address these problems, Plaintiff tried physical therapy and steroid injections. Eventually Dr. McFadden referred her to Dr. Todd Alexander, who performed back surgery on August 10, 2016. Plaintiff continued working as a nurse's assistant up until two days before this surgery, but never returned to work thereafter. For several weeks, Plaintiff felt an improvement in her pain, but then the pain returned to pre-surgery levels, perhaps getting

---

[1] This is not a complete summary of the medical or procedural history. It is merely an initial framework to help the reader understand the issues discussed below.

1

even worse. Plaintiff then stopped seeing Dr. Alexander. The reasons why are not entirely clear, but it appears they had a falling out.[2]

Plaintiff continued to received treatment from Dr. McFadden. He eventually referred Plaintiff back to Ortho Illinois, where Dr. Alexander worked. This time, Plaintiff consulted with Dr. Braaksma who eventually referred her to Dr. Enke to treat the pain. Plaintiff was still receiving treatment with Dr. Enke around the time of the administrative hearing. Over this treatment period, roughly from mid-2015 until mid-2018, Plaintiff had several MRIs and X-rays and other assessments and treatments.

In addition to her disability claim, which was filed on November 2016, Plaintiff also pursued a worker's compensation claim. Several evaluations were made arising out of these two cases.

On November 2, 2016, Plaintiff underwent a functional capacity assessment ("FCA") conducted by Donna Cox, who prepared a report. Ex. 7F. Ms. Cox made specific findings about the amount of weight Plaintiff could lift and how long she could work. For example, Ms. Cox concluded that Plaintiff could work three hours a day and could sit for two hours a day. R. 487. But her report also states that Plaintiff should participate in physical therapy and a work conditioning program "to allow for optimal functional progression to facilitate a potential safe return to work." *Id.* The FCA was done as part of the worker's compensation case.

In February 2017, Dr. Steven Mather performed an independent medical evaluation, which was also done for the worker's compensation case. Dr. Mather reviewed Plaintiff's

---

[2] Plaintiff's opening brief recounts some facts suggesting that Dr. Alexander was dissatisfied with Plaintiff or perhaps doubted her statements to some extent. These fact are not clear to the Court. However, the ALJ did not specifically mention this issue, and so this Court need not explore it further here. But this issue should be fleshed out and brought more into the open on remand to ensure that it is not operating as a covert influence on the decision.

medical history and examined her. In an opinion letter, he stated that Plaintiff reached maximal medical improvement after the October 2015 work injury and that she had no work restrictions from that injury. R. 668-69.

Two State agency physicians evaluated Plaintiff for the Social Security disability case. On February 28, 2017, Dr. James Hinchen completed an evaluation form. Ex. 1A. On April 21, 2017, Dr. Richard Bilinsky completed the same form. Ex. 3A. Neither doctor examined Plaintiff. Both concluded that she could do light work, but they both qualified their opinions by stating that Plaintiff would not be able to do light work until she fully recovered from surgery, which they stated was progressing "slowly" but would be complete one year after surgery (*i.e.* August 2017, which was several months after the date of their opinions). R. 98, 110.

In June 2018, Dr. McFadden submitted two opinions, both dated the same day and both setting forth similar conclusions. Exs. 16F, 17F. Because the ALJ relied on the same reasons to reject both, the Court will refer to them in the singular as if they were one joint opinion.

An administrative hearing was held on August 24, 2018. Plaintiff testified, along with a vocational expert. On October 2, 2018, the ALJ issued a ruling finding that Plaintiff could do sedentary work subject to certain restrictions, the most relevant one being that she could "alternate between sitting and standing by sitting for 25 minutes, then standing for five minutes before returning to the seated position," although she would have to work during the standing portion. R. 41.

The RFC analysis contains two main parts. The first is the credibility analysis. It mostly consists of a chronological summary of the medical visits and evaluations from 2015 to 2018. The discussion contains very little explicit analysis, making it difficult to tell exactly how the ALJ was interpreting the raw facts being recited. The second part is the analysis of the medical

opinions. The ALJ included one paragraph analyzing each of the following: the two State agency opinions; Ms. Cox's FCA report; Dr. Mather's opinion; and Dr. McFadden's opinion. The arguments in this case revolve around Dr. McFadden's opinion. But it is important to note—and this fact is perhaps the central fact justifying a remand—that the ALJ rejected *all* these medical opinions and also did not call a medical expert to testify at the hearing.

## DISCUSSION

Plaintiff has one basic argument for remand. She argues that the ALJ erred in giving no weight to Dr. McFadden's opinion. She raises both procedural and substantive challenges. Procedurally, she argues that the ALJ neglected to follow the two steps of the treating physician rule. *See* 20 C.F.R. § 404.1527. Specifically, the ALJ did not consider whether Dr. McFadden's opinion should have been given controlling weight at step one and then did not analyze the six checklist factors at step two. In Plaintiff's more blunt assessment, the ALJ's analysis was a "jumbled, messy mix of the two steps." Dkt. 20 at 2.

The Commissioner admits that the ALJ did not apply the checklist in an explicit or methodical way but argues that the ALJ basically conducted an implicit analysis. The Commissioner urges this Court to take a liberal interpretative approach by considering not just the formal analysis but by also looking at the broader opinion to, in effect, find clues about the ALJ's thinking. Ultimately, the Commissioner's position is that the ALJ need only provide some "good reasons" for rejecting Dr. McFadden's opinion. Dkt. 19 at 9.

Because the Court finds that the ALJ's analysis is inadequate even under the Commissioner's more deferential approach, the Court need not resolve all these procedural arguments under the treating physician rule. But it is still worth noting that if the ALJ had followed that rule more rigorously, some of the problems below might have been avoided. At a

minimum, the analysis would have been more complete. For example, although the ALJ briefly acknowledged in passing the general fact that Dr. McFadden was a treating physician, the ALJ never set forth details about the specific number of visits, for example. Not all treating physician relationships are the same. The ALJ did not discuss the issue of specialization either. It is not clear that all these factors would have automatically supported Plaintiff's argument. Some may have provided support of the ALJ's position.

Turning to the merits, the ALJ gave the following paragraph-long explanation for rejecting Dr. McFadden's opinion:

> The undersigned gives little weight to the opinion of treating source Michael McFadden, M.D. (Exhibit 16F). On June 25, 2018, Dr. McFadden opined that the claimant was limited to less than sedentary work; she would need to lie down four to six times during an eight-hour day; she had significant postural limitations; she must avoid even moderate exposure to extreme cold, wetness, or humidity; she must avoid all exposure to hazards; and she would likely be absent from work more than three times per month (Exhibit 16F). This assessment is not entirely consistent with the medical evidence of record. For example, in May 2018, the claimant had painless range of motion of the bilateral lower extremities and 5/5 muscle strength, bulk, and tone (Exhibit 14F/6). She had a normal gait, and was able to tandem walk, heel walk, and toe walk without an assistive device (Exhibit 14F/7). For these reasons, the undersigned gives little weight to this opinion, and finds that the claimant can perform sedentary work with a sit-stand option and additional postural and environmental limitations.

R. 45-46.[3] To distill this paragraph down somewhat, the first half is merely a summary. The second half sets forth one rationale. It is that Dr. McFadden's opinion was not consistent with the medical evidence. This conclusion in turn is supported by one piece of evidence, which is the treatment notes from Plaintiff's May 25, 2018 visit to Ortho Illinois. Ex. 14F at 6-8.

Plaintiff attacks this explanation on multiple grounds, but the overarching complaint is that the analysis was cursory. This Court agrees. The ALJ set forth a single rationale supported

---

[3] This paragraph analyzed one of Dr. McFadden's two opinions (Ex. 16F). For the second opinion (Ex. 17F), the ALJ merely stated that it was rejected for the same reasons given in this paragraph. R. 46.

5

by a single doctor's visit. To be sure, whether a doctor's opinion is consistent with the medical record is an important issue, arguably the most important one. *See, e.g.*, *Lacher v. Saul*, __ Fed. App'x. __, 2020 WL 7042959, *3 (7th Cir. Dec. 1, 2020) (affirming the ALJ's rejection of a treating physician opinion because it "painted a more severe picture" of the claimant's condition "than suggested by the objective medical evidence"). Consistency is also central to the treating physician rule, being mentioned at both steps one and two (*see* checklist factors 3 and 4). At the same time, when an ALJ relies on just one rationale, it raises the stakes in a sense. If that rationale is weakly supported, as is the case here, then there is nothing else to fall back on. The underlying premise for having a checklist in the first place is to require consideration of multiple rationales in an overlapping and reinforcing analysis.

The one piece of evidence relied on by the ALJ—the May 25, 2018 treatment notes—feels cherrypicked because it is not clear that this visit was especially representative. For one thing, as Plaintiff argues, these examination findings were made by a physician's assistant, not by the doctor. R. 633. Also, the ALJ left out some contrary examination findings—specifically, that Plaintiff had "limited lumbar range of motion secondary to pain at the extremes of motion." R. 631. More broadly, Plaintiff argues that this visit was not a fair snapshot because other contemporaneous findings made by Drs. McFadden, Enke, and Weiss showed greater problems. *See* Dkt. 13 at 14.

The Commissioner does not respond to these specific points, but states more generally that the ALJ "discussed" additional supporting evidence earlier in the decision. But this is a weak defense because this discussion was contained in the ostensibly neutral, just-the-facts summary of the medical record in the earlier credibility analysis. The ALJ provided little overt analysis, forcing this Court to speculate about what the ALJ's exact conclusions were.

But even if we accept the Commissioner's argument that the ALJ relied on more than just this one piece of evidence to support the broader claim that the objective evidence was mild, this conclusion would not necessarily undermine Dr. McFadden's opinion. The Seventh Circuit has repeatedly noted that mild objective evidence by itself is not always determinative, especially when the ALJ, as here, already found at Step Two that claimant's degenerative disc disease was a severe impairment. *See Adaire v. Colvin*, 778 F.3d 685, (7th Cir. 2015) ("[The ALJ's] principal error, which alone would compel reversal, was the recurrent error [] of discounting pain testimony that can't be attributed to 'objective' injuries or illnesses—the kind of injuries and illnesses revealed by x-rays.").[4]

This Court is not itself offering a definitive answer as to how the objective evidence should be interpreted. But the case law makes clear that an ALJ who engages in a layperson analysis by plucking out technical findings from MRI reports and the like is improperly playing doctor. *See, e.g., Israel v. Colvin*, 840 F.3d 432, 440 (7th Cir. 2016) ("Because no physician in the record has opined on whether these results [from two MRIs] are consistent with Israel's claim of disabling pain, and because the reports are replete with technical language that does not lend itself to summary conclusions, we cannot say whether the results support or undermine Israel's claim."). What is missing from the ALJ's analysis is how the various doctors of record interpreted the same tests and examination findings and what recommendations they made in reliance on them. Consider Dr. Alexander who performed the back surgery. In his examination of Plaintiff a few weeks before surgery, he made findings similar to those made in the May 25,

---

[4] After the ALJ's decision was issued, Plaintiff's counsel interviewed Dr. McFadden to get more insight into his opinion. In this interview, he made a similar statement about his experience in interpreting the objective evidence as it relates to subjective pain: "It's always difficult, because clinically I've seen very bad reports, then people doing clinically well. I've seen some reports that don't look bad and the tests don't look bad and the patient is doing poorly." R. 22.

2018 visit (*e.g.* he found that Plaintiff's motor strength was 5/5). R. 334. The question thus arises as to why he would have operated if these findings indicated only minor problems.

To sum up, the Court finds that ALJ's explanation for rejecting Dr. McFadden's opinion relied too much on a "sound-bite" approach and on the ALJ's "own spin on the medical record." *Czarnecki v. Colvin*, 595 Fed. App'x. 635, 644 (7th Cir. 2015). The Commissioner's brief spends much time setting forth general principles about the ALJ's allegedly minimal duty of articulation (*e.g.* the ALJ does not have to prove a negative or discuss every piece of evidence). But these truisms lose much of their force when there is a treating physician opinion. The treating physician rule rests on the premise that these physicians have special insight based on their ability to observe the claimant repeatedly over an extended period.

The decision to remand is also supported by the fact that many of these same criticisms (vagueness, cherrypicking, and doctor playing) are applicable to other parts of the decision. Because the parties focused mostly on Dr. McFadden's opinion, the Court will only briefly mention a few other areas.

As noted previously, the ALJ rejected not just Dr. McFadden's opinion, but all the medical opinions. Although Plaintiff does not attack the ALJ's analysis of these other opinions (likely because they do not all help her case), similar criticisms could be raised about this analysis. For example, the ALJ rejected the two State agency opinions, as well as Dr. Mather's opinion, primarily because they were supposedly inconsistent with a 2017 MRI showing that Plaintiff's condition was "worsening." R. 45. But this conclusion, which feels like another isolated data point, rests again on doctor playing.

The ALJ's credibility analysis was also incomplete. This analysis rested almost entirely on the single rationale that the objective evidence was mild. The ALJ gave either no, or very

little, attention to the other SSR 16-3p factors. The ALJ did not acknowledge, for example, all the many medications Plaintiff was taking at the time of the hearing. These included Norco (4 times a day), Flexeril (1 to 2 times a day), Amitriptyline (for nerve pain and depression), and Meloxicam (for inflammation). R. 76-77. The ALJ did not seriously consider Plaintiff's testimony that these medications made her "drowsy a lot of the time." R. 65. The only analysis addressing the SSR 16-3p factors, other than the mild objective evidence point, was the following two sentences: "No treating provider has recommended further surgery. Despite her back pain, the claimant was able to drive and care for her two young children[.]" R. 44. The first sentence suggests a conservative treatment rational, but the ALJ never fully explored this issue. Why were all of Plaintiff's collective treatments considered to be conservative? Were there other treatments available that Plaintiff's doctors offered but she refused to try? Did she have any insurance or other problems getting treatment?[5] These are standard questions that should have been explored and discussed. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

As for daily activities, the ALJ should have fully considered the contrary evidence. At the hearing, Plaintiff testified about limitations on her ability to drive, shop, cook, and even dress herself. She stated, for example, that she often had to lie down for 20 to 25 minutes after helping get her children up and out to school. R. 66. She stated that she often had to pull the car over and rest when driving. R. 80. She described dinner with her two children as follows:

> I have to cook more prepared meals, just something quick that can be thrown in the oven. I can't sit at my kitchen table with my children because I can't stand to sit in the chairs. So, we eat, we have a table in the living room. They sit at the table and I sit on the couch.

R. 66. The ALJ should consider all this evidence on remand.

---

[5] *See, e.g.*, R. 77 ("I've been fighting, and fighting [to get treatment]. I have the medical card, and it's so hard. I have the right to see somebody, but they have to approve it. And that's a long process.").

Any remaining issues not discussed herein can also be addressed on remand. The Court acknowledges that Plaintiff's counsel interviewed Dr. McFadden after the ALJ's decision was entered. *See* R. 7-25 (interview transcript). The Commissioner objects to this new evidence on timeliness and materiality grounds and further argues that the doctor's testimony is so vague that it would not change the analysis. These arguments can also be considered on remand.

The Court is not indicating that a particular result should be reached on remand. Plaintiff's case is not without weaknesses, and too many important questions remain open. This Court thus declines Plaintiff's request to award benefits outright. Plaintiff is a young adult who potentially has many productive work years ahead of her if she is able to work. So it is important to both sides that a careful and medically-informed analysis be conducted. The record should be developed further by, among other things, calling an expert to testify at a new hearing.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and this case is reversed and remanded for further consideration.

Date: December 7, 2020   By: *Lisa A. J*
  Lisa A. Jensen
  United States Magistrate Judge

10